JOSEPH L. REEVES, guardian in lunacy of Isabella Iredell,

v.

ALLAN S. MORGAN, REBECCA C. MORGAN, his wife, WILLIAM A. MORGAN and JESSE C. MORGAN.

1. This court has jurisdiction to enforce payment of a non-negotiable bond which has been lost or destroyed or has come to the possession of the obligor and such possession is denied by him.

2. When a married woman is sued upon a joint and several obligation which does not show on its face that she occupied the position of surety, the burthen is upon her to set up and prove the defence of suretyship on her part.

Final hearing on bill, answer and proofs.

*Mr. Austin H. Swackhamer*, for the complainant.

*Mr. Robert S. Clymer*, for the defendants.

PITNEY, V. C.

On the 15th of February, 1890, a jury of Gloucester county, convened upon a writ *de lunatico inquirendo* issued out of this court, found Mrs. Isabella Iredell, of Mantua, in that county, a lunatic and of unsound mind, without lucid intervals, and incapable of the government of herself and her estate, and that she had been in the same state of lunacy for five years before that date. The return of the inquisition embodying this finding was duly confirmed by this court, and, upon being sent down to the orphans court of Gloucester county, the complainant was, about the 1st of April, 1890, appointed her guardian in lunacy.

By this bill he seeks to establish and enforce two several bonds, one of which was secured by a mortgage, which he alleges were given to the lunatic by the defendants, or some or one of them, and which bonds, with the mortgage, have been lost or destroyed or have come to the hands of and are concealed by the defendants. The first of these securities is a bond with a war-

rant of attorney to confess judgment, and a mortgage to secure it, dated March 6th, 1879, executed by the defendant William A. Morgan to the lunatic, to secure $500 in one year, with interest, covering a house and lot in Mantua, now owned by the defendant Rebecca C. Morgan, and upon which the defendant Jesse C. Morgan holds a second mortgage. He is made a party on that account, but has not answered, and will not be further noticed. The existence of this bond and mortgage is admitted. The second of these securities as described is the joint and several bond with warrant of attorney to confess judgment, executed, as is alleged, by the defendants Allan S. Morgan, Rebecca C., his wife, and their son William A. Morgan, to the lunatic to secure $600 in one year, with interest, and dated about July 25th, 1883. The existence of this instrument is denied by the defendants.

The defence as to the $500 bond and mortgage is that it has been paid in full and duly and properly cancelled of record. In support of this allegation a receipt is produced, signed by Mrs. Iredell, in these words—

"MANTUA, N. J., May 19, 1887.

"Received of Rebecca C. Morgan $525 for principal and interest in full for bond and mortgage supposed to be lost or mislaid, I hold against the house and lot on Mantua Avenue in Mantua N. J.

"ISABELLA IREDELL."

and also a satisfaction piece executed and duly acknowledged by Mrs. Iredell on the 26th of July, 1889, acknowledging payment in full of the amount due upon that mortgage.

With regard to the alleged $600 bond the defendants admit that Mrs. Iredell did loan $600 to Allan S. Morgan on September 21st, 1883, and they allege that he gave her his bond for that amount without security, and that he paid the amount to her in four several payments, the last, for $165, on August 25th, 1887, and he produces her receipt for that payment in these words: "Mantua, N. J. August 25, 1887, Received of Allan S. Morgan $165 balance in full on bond which cannot be found. Isabella Iredell."

The value of these receipts and the sealed discharge as evidence depends upon the mental condition of the lunatic at their

Reeves v. Morgan.

date.   The inquisition reaches back to February, 1885, and over-rides their date two years and more.   As against the defendants it is on its face, according to well-settled rules, *prima facie* evi-dence only.  · But in this case more strength as against them is claimed for it, for the following reasons : At its date Mrs. Ire-dell was living, and had been for several months, in the family of the defendants, and was under their control.   By the family I mean Allan S. Morgan and his wife, Rebecca, and their son, William A. Morgan, a young man living at home.   The bill alleges and the answer admits that of these three answering defendants, the father and son appeared in person, and that all three were represented by counsel before the inquisition, and contested the insanity of Mrs. Iredell.   It also appears that they did not produce her there to be seen by the jury, though she was not over three miles away and quite able, physically, so far as appears, to· attend.   These circumstances do certainly give the inquisition increased weight as against these defendants.   But I do not find it necessary to determine whether they render it con-clusive as against them.

At the hearing, witnesses upon the subject were produced by both parties, and upon the testimony given by them, and quite independent of the inquest, I come without difficulty to the con-clusion that the condition of Mrs. Iredell's mind at the date of the receipts in question was such, at best, as to render them prac-tically worthless as evidence.   Here, again, the defendants did not produce Mrs. Iredell at the hearing, although alleging that she was sane, and that her mind and health had both improved materially since her residence with them, which still continued. I do not deem it worth while to state the evidence at length. Mrs. Iredell is not far from seventy years of age.   She has no children.   Her husband was· killed in the late war, and she has enjoyed, and still enjoys, a widow's pension of $12 a month. For many years she kept an ice cream, cake and candy shop in Mantua, and was very saving and careful in her expenditures, and saved money enough to own a house there, and had consid-erable loaned out on bonds and mortgages.   Mrs. Rebecca C. Morgan is her sister of the whole blood, and a Mrs. Harriet

Reeves *v.* Morgan.

Sooy, wife of Samuel T. Sooy, and a Mr. Paul, all living in Mantua, are her sister and brother of the half blood. Besides these she has a nephew of the whole blood. She never had business talent sufficient to attend with safety to the investment of her money, and at all times depended upon her relatives and friends—mainly Mr. Sooy—to do it for her. Before the middle of the last decade she began to manifest a change in her habits of mind and body; she became forgetful and slovenly and filthy in her dress and house to the last degree; withal she was credulous, confiding and easily imposed upon. Two physicians of the village were sworn; one pronounced her to be suffering from a mild type of what he called "perceptional insanity." She had, he said, fixed hallucinations and delusions, and was incapable of reasoning and exercising judgment, and had been in that condition for five years or more. He also swore that she was credulous and easily imposed upon. The other physician, while admitting that her mind had been at times, at least, for several years in an abnormal condition, was disposed to believe it might have been, and probably was, caused by the use of opium in some of its forms. He kept a drug store, and had sold her some laudanum on a few occasions, and inferred that, in addition, she had procured the drug at the country stores. But the salesman at the store near her residence, which she patronized, had never sold her any, nor known of her having inquired for it, and after she went to live with the defendants she manifested no craving for it, as she undoubtedly would have done had she been in the habit of taking it.

The remaining questions in the case are the following:

*First.* Was the $600 bond in fact executed by the three defendants, Allan S., Rebecca C. and William A. Morgan, as alleged by the complainant, or by the first-mentioned person alone, as alleged by the defendants?

*Second.* Have either or both of the bonds above mentioned been paid?

*Third.* If the $600 bond has not been paid, has this court jurisdiction to enforce it?

*Fourth.* If so, then is it enforceable against Mrs. Morgan?

Reeves v. Morgan.

I will consider the first and second questions together. Mrs. Iredell for many years lived alone in her house with the exception of a boarder, a Mr. Middleton, a middle-aged widower, who lived with her for many years, including several in the first half of the last decade. Just when he ceased to live with her does not appear, but he was not living with her in 1887, and did not after that date. Mr. Samuel T. Sooy, the husband of her half-sister, above named, swears that about the 25th of July, 1883—which date is fixed with reasonable certainty by an entry on Mrs. Iredell's bank account—she requested him to attend to carrying through a loan of $600 she proposed to make to the Morgans on their joint bond. The financial condition of the Morgans at that date was as follows: Allan S. Morgan had been the owner of real estate in Mantua, including a house and lot, a small farm and a carriage manufactory, and was and had been for many years engaged in the business of manufacturing carriages. In 1879 he had failed in his business, and his real estate, which was heavily mortgaged, had been sold by the sheriff, and had been bought in by his wife, and the business was from that date carried on under his supervision and management, but in the name of his son, William A. Morgan, who lived with his parents, and the father continued from that time to be, and was up to the date of the hearing, confessedly insolvent. In 1880, shortly after this failure, William A. Morgan conveyed to his mother the house and lot which he had the year before mortgaged for $500 to Mrs. Iredell, so that at the date of the proposed loan all the property of the Morgans was owned by the wife, while the business was managed by the father with the aid of the son, and in the son's name. In pursuance of Mrs. Iredell's request, Mr. Sooy, as he swears, went in July, 1883, to the office of the Morgans, in their factory, and there, in his presence, the three, father, wife and son, executed a joint and several bond in the usual form with warrant of attorney, to confess judgment to Mrs. Iredell to secure $600. He, Sooy, witnessed it, and took it to his house to deliver it, and to receive from Mrs. Iredell and hand to the Morgans the money upon it. She came into his house with the money in bills, and it was counted out and the bond was pro-

duced and read over. Mrs. Iredell asked if he, Sooy, was going to sign it also, and he replied that he was not, except as witness. She then declined to loan the money on the security of the Morgans alone, and took it away, and Sooy redelivered the bond to the Morgans. A. very few days afterwards, to wit, on the 31st of July, 1883, he, at Mrs. Iredell's request, took from her the $600, and deposited it to her credit in the bank at Woodbury. The bond in question was seen on this occasion by Mrs. Sooy, who swears it was read in her presence by her husband, and that the names of the three Morgans were in it. On the 21st of September following Mrs. Iredell signed a check, in the handwriting of William A. Morgan, and in his favor, on the Woodbury bank for $600, and by it this money was transferred on the books of the bank from Mrs. Iredell's credit to that of William A. Morgan. Mr. Sooy further swears that the next spring (1884) he went, as he was in the habit of doing, to Mrs. Iredell's house to make some endorsements for her of interest on some of her securities, and then discovered among her papers this identical $600 bond, which had been executed in his presence and witnessed by him, and which he had returned to the Morgans, and he then learned from Mrs. Iredell, and also afterwards in conversation with Allan S. Morgan, that the loan had been carried through on the bond he had witnessed without further security. He further swears that frequently between that time and 1887 he had occasion to overhaul Mrs. Iredell's securities for the purpose of endorsing payments of interest—persons paying interest to Mrs. Iredell were in the habit of asking Mr. Sooy or some other person to be present as witness and to make the endorsement—and always saw this bond among her papers, and on several occasions opened it, and saw two or three endorsements of interest upon it. About the middle of May, 1887, Mr. Sooy was called upon to go to Mrs. Iredell's house to make an endorsement of interest, and, as usual, she produced all her securities, and he discovered among them, for the first time, three bonds with warrants of attorney to confess judgment, and three mortgages upon land to secure them, made by Mr. Middleton to her, and all the mortgages were unrecorded. One of

Reeves v. Morgan.

these mortgages for $1,000 covered a house and lot in Mantua, upon which Mr. Sooy happened to know that Mr. Middleton had executed a later mortgage, which was duly recorded, and which rendered Mrs. Iredell's mortgage worthless. He at once called on and consulted the elder Morgan upon the situation. He suggested that all Mrs. Iredell's papers should be brought to his (Morgan's) office and looked over, and that judgment should be entered up on the $1,000 bond—the mortgage—security for which had been cut out by the later one. All this was done— the papers, as Sooy swears, were put in Morgan's possession— judgment was entered on May 20th and execution issued against Middleton. The result of this was that Middleton, on the 26th of May, arranged the whole affair by conveying to Mrs. Iredell certain real estate in Camden county. This was done by the advice and under the supervision of both Morgan and Sooy, and with the consent of all the heirs and next of kin. The next day, May 27th, Mrs. Iredell appears to have missed her Morgan securities and spoke with a neighbor, a Mr. William Long, about it, and they went together, as Long swears, to Morgan's, and she asked the elder Morgan for her papers. He replied that she had them. She insisted to the contrary, but without avail, and went away without them. The witness then said to Mr. Morgan, "You admit you owed these papers?" and he said, "Yes." This circumstance appears to have come to Mr. Sooy's knowledge, and he went to Morgan's and inquired about it. The elder Morgan said he was afraid to have the papers returned to Mrs. Iredell, because she was liable to be influenced by Middleton, and that he might come to her house and, in revenge for Morgan's past conduct in procuring judgment to be entered against him, induce her to enter up judgment on all the bonds—William's for $500 and the joint bond for $600, and also a bond for $400 which she held against Sooy; and it was concluded and agreed upon between the two to let the papers remain in Morgan's possession. From that time forward the two Morgan bonds and the mortgage were seen no more. The fact that they were in Allan S. Morgan's possession was not known outside the family, and they were supposed by the neighbors to be lost. On

that occasion, about May 27th, Mr. Sooy swears that he again
saw and examined, in Morgan's possession, both the $600 joint
and several bond and the $500 bond and mortgage made by
William. Mr. Sooy swears to another conversation with Mr.
Morgan, had two or three weeks later, in which these papers
were spoken of as being bonds and mortgages made by the
Morgans. Later on, in the fall of 1887, Mr. Hugh Long
swears to a conversation had by him with Allan S. Morgan
about Mrs. Iredell's affairs, in which he asked Morgan, as he
says, about two papers of hers which he understood were lost,
" and we talked about how to get out of the difficulty—whether
new papers should be issued." He seemed to think that new
papers would be a very good way, but he said, " if those papers
are never found I shall pay the bill anyhow," and made no pre-
tence that they were paid. A Mr. Sommers swears that shortly
after the conveyance from Middleton, which was May 26th,
1887, he had a conversation with Allan S. Morgan, in which he
said that Mrs. Iredell had been to see him with William Long
and had lost some papers, among others a mortgage, and said
that if they proved to be lost new papers could be executed in
their place. William L. Paul, the half-brother of Mrs. Iredell,
swears that in 1887 Allan S. Morgan spoke to him and said that
Mrs. Iredell had lost the obligations she had against them, the
Morgans, and that they had not paid them, and that they did not
pay the interest because she had lost them, and again in 1888 he
(Paul) spoke to the elder Morgan and asked why he did not pay
the interest on the bonds, and he said " she [Mrs. Iredell] had
not yet procured them." And again in June, 1889, shortly be-
fore she went to live with the Morgans, the witness again spoke
to Allan about the interest, and asked if he had paid it, and he
said, " No, I don't intend to pay until she procures these bonds."
At no time, according to these witnesses, did he pretend that they
had been paid. In June, 1889, Mrs. Iredell's condition became
such that it was unsafe for her to live longer alone, and the ques-
tion arose among her relatives (the Morgans and Sooys and Mr.
Paul) whether she should be cared for privately or sent to a hos-
pital, and it was agreed that she should be taken to the Morgans

and kept by them at $5 a week, to be applied—as sworn to by Mr. and Mrs. Sooy and their daughter Mrs. Paris—on account of what the Morgans owed her.   Mr. Sooy swears that Allan S. Morgan said to him that her board was to go on account of what they owed on the bonds, and Mrs. Sooy and her daughter swear that Mrs. Morgan told them it was to go against what they (the Morgans) owed her, "and they owed her so much."   And Mrs. Paris further swears that about the same time the probability and possibility of Mr. Middleton having procured a will in his favor from Mrs. Iredell was spoken of by Mrs. Morgan, and she said that if such a will should turn up after Isabella's death, "Middleton or his sons would be none too good to come right in and put the sheriff on them."   Now this could only be done by entering up judgment on the bond or bonds with warrant of attorney to confess judgment, and to such a proceeding it is plain the witness understood Mrs. Morgan to allude.

To all this evidence the three defendants involved give on the stand an unqualified and complete denial.   They each deny that any such joint bond was ever talked of, prepared or executed. The father and son swear that the father on his own account borrowed the $600, on September 21st, 1883, and gave his individual bond for it, which was prepared and witnessed by the son ; that the check was written by the son and signed by Mrs. Iredell, and by it the amount transferred to the son's credit, and that the amount was paid out by him to his father as he required it.   The father swears that he paid the principal of this bond to Mrs. Iredell in four payments—the first, of $250, about six years before the hearing ; the second, of $150, a few months later ; the next, of $40, still later, and the balance of $165 on August 25th, 1883.   The first three payments were, he says, endorsed on the bond, and for the last he produced the receipt of Mrs. Iredell of the date last mentioned.   No witness is produced in corroboration of these payments, or either of them, nor any receipt shown except for the last.   He denies that on the occasion of the entering up of judgment on the Middleton bond, or at any other time, he had any of Mrs. Iredell's papers in his possession, or at his office, and he denies that he retained them

there by arrangement with Mr. Sooy to protect the bondsmen against Middleton, as sworn to by Mr. Sooy. He swears that on April 28th, 1887, three weeks before the discovery of the Middleton bonds, Mrs. Iredell asked him for interest on his son's $500 bond, and he paid her $20 on account of it, and at the same time learned from her that she had mislaid that bond and his own for the $600; that a short time after the Middleton affair was settled, and his three bonds paid by the conveyance of the real estate, and delivered up to him, he, Allan S. Morgan, went to Mrs. Iredell's house to have her search for the missing papers, and found that not only was his and his son's bonds missing, but also one of the Middleton bonds. Now at that time the Middleton bonds had been paid and handed to Middleton.

Now, upon this evidence the question whether the $600 Morgan bond was signed by all three, or by the father alone, stands upon the evidence of Samuel T. Sooy and his wife on the one side and the three Morgans on the other, with the aid of the attending circumstances and the probabilities of the case. Judging from these latter, and the manner of the witnesses on the stand, I became strongly impressed at the hearing with the truthfulness of the Sooys, and a careful review and consideration of the evidence, since being written out, has served to strengthen rather than weaken that impression. I think it highly improbable that this lady, who was very careful and thrifty in money matters, would in 1883, when her mind had not materially failed, have loaned her money to the elder Morgan, who was notoriously insolvent, without security, and I also find it difficult to believe that Samuel T. Sooy could have invented out of the solid the story which he related upon the stand. And then the drawing of the check to the son and the placing of it to his credit in bank was not, to my mind, satisfactorily explained on the basis of a loan to the father alone. Then the loss of the bonds and mortgage. It seems to me surprising, to say the least, that these Morgan securities alone of all those she had should disappear so mysteriously and permanently as the Morgans's theory requires they should have done. It seems to me they would have sooner or later come to light. Then the evidence of the elder Morgan

that he paid a final balance on this bond on August 25th, 1887, is not only unsupported by any evidence except the bare receipt, but is contradicted by several witnesses—Paul, Sommers and Long—to whom he afterwards admitted that he still owed the money. At the date of this alleged final payment, August, 1887, Mrs. Iredell's infirmity and incapacity was well understood and recognized in the neighborhood, and the evidence shows that the ·elder Morgan himself spoke of it, and the practice of having witnesses to payments of money to her was almost universal, and it does seem incredible that he should go alone and pay her money and take her bare receipt without a witness, against a bond which was lost, and which had annexed to it a warrant of attorney to ·confess judgment. And then the receipt itself does not describe the bond in such a manner as that it could be identified, and is applicable as well to a bond made by the three as to one made by the elder Morgan alone. In short, I think the story told by Allan S. Morgan of payment of this $600 bond so incredible, and its truth so thoroughly overcome by other evidence, that I must treat it as a fabrication, and apply to his evidence with regard to the number of names signed to the bond the maxim of *false in one, false in all.* The same remark applies to the evidence of the son as to the payment of the $500 bond and mortgage. He swears that he learned late in April, 1887, that these securities were lost or mislaid ; that the interest had been allowed to fall in arrear by Miss Marple, the then owner of the mortgaged premises ; that she re-conveyed them at about that time to his mother ; that his father paid his aunt $20 on account of interest ; that she learned that the mortgaged premises had been ·conveyed to his mother—demanded more interest ; that he asked her if she had found the papers ; that she answered that she had not, and then that she demanded either new papers or the payment of the money, and that he told her he would pay it, and that he accordingly went to her house on May 19th, and, without making any search among her papers or effects for the missing securities, and without any witness, he paid her with his own money principal and interest in full, and took the simple receipt above set forth. The date of this alleged payment is important.

It was just after the discovery of three Middleton bonds and unrecorded mortgages, and the very day before the judgment on one was entered against Middleton. The elder Morgan swears that after he learned the facts about the Middleton securities, he arranged with Mr. Jessup, a lawyer at Woodbury, to come down and enter up the judgment, and Mr. Jessup swears that he was waited upon by either the father or son and consulted about the situation, and advised that judgment should be entered upon the bond, and that he went down to Mantua and took Mrs. Iredell's affidavit on the 20th. Now, it is quite manifest that this Middleton bond affair was a matter of discussion in the family between father and son, and that the employment of Mr. Jessup was known to the son. He is apparently a person of intelligence, and must have been aware that not only was there a mortgage standing of record against his mother's property, but also his own individual bond and warrant of attorney to confess judgment was outstanding; and yet, without making any search himself for the missing papers, without consulting counsel, without taking any precautions, over and above a simple unwitnessed, unacknowledged receipt, against his outstanding bond, or any clearance of the record of the mortgage, he paid the debt, and that at a time when he had every opportunity and inducement to consult counsel about it. I find myself quite unable to believe this story. There is, however, I think, just a grain of truth in it. I have alluded to the call made by Mrs. Iredell with Mr. Long, just after the settlement of the Middleton affair, upon the elder Morgan to demand her securities, and the suggestion made by Mr. Long and again by Mr. Sommers that the lost securities she held against the Morgans be replaced by new ones. Now, I think it fairly inferable that this suggestion was repeated by Mr. Long to Mrs. Iredell, and that she, still impressed with the idea that her papers were with the Morgans, went to them a second time and demanded either her money or new papers.

There are one or two other matters worthy of consideration. Among the securities held by the old lady, in May, 1887, was the bond of Mr. Sooy for $400. This he paid off by depositing $400 to her credit the next spring, April 18th, 1888. That

money, or the most of it, remained to her credit until March 15th, 1889, which was three months before she went to live with the Morgans.    At that date Mr. Sooy desired to borrow $400 to help him make out a loan which he proposed to make of $2,000; and, on the 15th of March, 1889, she, at his request, drew her check for $366.75 to his order and handed him $33.25 in currency, and for that sum he gave her his note for $400, which he did not leave with her but placed among other securities of hers which he had for safe keeping.    That $400 note he paid on the 20th of November, 1889, by depositing $400 to her credit in bank on that day.    Three days later, on the 23d of November, 1889, William A. Morgan procured from her her check for $400 and used the money.    Previous to that, on the 5th of August, 1889, the Morgans procured Mrs. Iredell to convey to Mrs. Morgan the house and lot which she owned in Mantua, and later on, on the 3d of December, 1889, they also procured her to convey to her the tract of two hundred and fifty-four acres in Camden county, which had been conveyed to Mrs. Iredell, May 26th, 1887, by Mr. Middleton.    The procuration of these conveyances without consideration are justified by the Morgans, on the ground that they feared that Mr. Middleton might have procured from her a will in his favor, and that, if she should die, might produce that will and take the property, and that they felt justified in procuring the conveyances which they claimed were intended to be in the nature of testamentary dispositions. With regard to the procuring of the $400, they claim that they were justified in holding it in payment of the board of Mrs. Iredell, and this conduct and claim on their part led to the proceedings which resulted in the appointment of a guardian.    This procuring control and possession of nearly all the lunatic's property is claimed by the complainant, and I think with some force, to be in keeping with their suppression of the two Morgan bonds and their pretence that they were paid.

Again, it seems to me improbable that so much money—$500 on the 19th of May, 1887, and $165 on the 25th of August, 1887—could have been paid to Mrs. Iredell without sooner or later making its appearance and being known or heard of by

somebody in the neighborhood; and it is a circumstance not to be overlooked, from the defendants' standpoint, who allege Mrs. Iredell to be sane, that they did not produce her at the hearing to support their theory on the facts; while, on the other side, it would have been absurd for the complainant, from his standpoint, to produce her.

After a careful review of all the evidence, my conclusion is that the truth lies with the complainant; that the $600 bond was executed by all of the Morgans; that neither it nor the $500 bond and mortgage have ever been paid; that they were in May, 1887, on the occasion of the Middleton affair, taken to the Morgans and lodged with them; that after the settlement with Middleton it was thought best by the Morgans and Mr. Sooy, against whom she held a bond for $400, that for their mutual protection against Middleton the securities should not be returned to her; that to carry out that plan the Morgans declared them to be lost; that later on they conceived the plan of declaring that they were paid, and, to substantiate their assertion, procured her to sign the receipts in question, probably after she went to live with them, dating them back to the dates they bear; that desiring to have the record of the mortgage discharged, and knowing that it was understood in the neighborhood that the papers had been lost, and fearing on that account to present the mortgage for cancellation, they procured a commissioner of deeds, living at Glassboro, seven miles distant, and who had never heard of Mrs. Iredell's mental infirmity, to come to their house and take her acknowledgement to a satisfaction piece. All this the condition of her mind enabled them to do with perfect ease, and without exciting the suspicion of the commissioner, who performed his duties in a perfunctory manner.

*Third.* The next question to be considered is as to the jurisdiction of this court to enforce the $600 bond.

No question was raised by the answer or by counsel of the defendants at the hearing as to the jurisdiction of this court to establish and enforce either of these securities, and there can be no doubt as to its power to restore the cancelled mortgage. But as to the $600 bond, I suggested to complainant's counsel at the

Reeves v. Morgan.

hearing that the remedy was complete and adequate at law, and therefore this court should not interfere, and that was my impression at the time. But a further consideration and examination of the authorities has led to a modification of my views.

The only foundation of the jurisdiction of this court to grant relief upon lost instruments of this sort was that the remedy at law was either entirely wanting or inadequate. *1 Story Eq. Jur.* § *81 et seq.; 1 Pom. Eq. Jur.* § *71.* The difficulty in the way of suing at law upon a lost bond in the ordinary form was the necessity of making profert. *Whitfield* v. *Fausett, 1 Ves. Sr. 387.* Says Lord Hardwicke, in a considered judgment (at *p. 393*): " If a man has lost a bond he is entitled to come into equity not only for a discovery but to have a decree for payment because he cannot declare without making profert, the defendant being entitled to oyer." And such was undoubtedly the ancient rule of pleading at law. *Leyfield's Case, Co. pt. 10 p. 92; Com. Dig. Pl. O. & P.; Thoresby* v. *Sparrow, 1 Wils. 16; S. C. sub nom. Soresby* v. *Sparrow, 2 Str. 1186.* This rule was relaxed in *Read* v. *Brookman, 3 T. R. 151,* in the case of a conveyance of land, on the ground that the conveyance or grant of an interest in land is to be presumed after long adverse possession or enjoyment, and hence it was unnecessary to make profert. And later on it was extended to all sorts of sealed instruments, the court establishing a rule that excuse might be stated and proven for not making profert.

But it is entirely settled that if the jurisdiction of this court has once been established over a certain subject or class of cases, it will not be taken away by the fact that courts of law have acquired jurisdiction of the same subject or class of cases, whether that jurisdiction be acquired by relaxation of its own severe rules or by statute. Lord Thurlow, in *Atkinson* v. *Leonard, 3 Brown Ch. C. 218* (at *p. 224*), speaking of the alleged relaxation of the rule at law, says : " But the question is whether this court is ousted of its jurisdiction so that a demurrer would lie to a bill for [founded on] a lost bond. * * * It does not follow because the court of law will give relief that this court loses the concurrent jurisdiction which it always had." And in *Toulman*

v. *Price, 5 Ves. 235*, Lord Eldon (at *p. 238*) says : " For a great while courts of law would not assist a man who could not make profert. But there was no doubt, the debt was not extinguished ; and though the party could not comply with the requisites to support an action, there was no doubt a bill in equity would lie, calling upon the party either to admit the bond or to give him an opportunity of proving the execution and the loss, and a court of equity always interfered. But of late courts of law have from the hardship waived that rule, and permitted a man to declare upon a lost bond." And he then proceeds to cite with approval *Atkinson* v. *Leonard*, before Lord Thurlow, and to hold that the change in the practice at law did not oust the jurisdiction of equity. He reiterates the doctrine with great force and emphasis in *Bromley* v. *Holland, 7 Ves. 3* (at *p. 19*), saying : " I am quite sure Lord Thurlow's opinion was that courts of law, properly if you please, taking upon themselves to do that by new forms of pleading which they had never done before, as dispensing with profert, or permitting the averment of a consideration not in the body of the deed, could not destroy the ancient jurisdiction of this court in matters of that nature." And in *East India Co.* v. *Boddam, 9 Ves. 464* (at *p. 466*), he declares that " the jurisdiction of this court upon lost bonds is very ancient; founded upon a notion, acknowledged until a very late period, that there was no remedy at law upon a lost bond, as you could not make profert."

I have made these references and citations at length because they deal with the very instance of concurrent jurisdiction now before the court, and illustrate how deeply it is rooted, and how highly it has been cherished by the fathers of our equity system.

In support of the jurisdiction in this case, I would have contented myself with the authority of *Force* v. *City of Elizabeth, 12 C. E. Gr. 408*, which was affirmed, so far as concerns the point in question, in *2 Stew. Eq. 587*, but for the slight difference in the circumstances of the two cases. The instrument here sued on is an ordinary bond, payable to Mrs. Iredell, the title to which would not pass by delivery without formal assignment, while the bond sued upon in *Force* v. *City of Elizabeth* was payable to

bearer, and the holder of it stood upon and—to use the language of the chief-justice (*2 Stew. Eq. 590*)—"claimed by force of the direct promise of the city made to himself."' The jurisdiction there stood on the broad ground that indemnity against the payment of the bond in the hands of a *bona fide* holder was a substantial prerequisite to a right to recover upon it, and that a court of law could not, without statutory authority, require or deal with such indemnity; while with regard to an ordinary bond, such as we find in this case, the ground of the jurisdiction depends upon the more narrow, technical and debatable ground of the necessity at law of making profert.

I conclude that the court has jurisdiction.

*Fourth.* The more troublesome question is as to whether Mrs. Morgan should be held liable. She was a married woman at the time she executed the bond, and for that reason would not be liable, even in equity, if she in fact occupied the position on the bond of a mere surety. This was so held in *Perkins* v. *Elliott, 8 C. E. Gr. 526,* at the common law, and before the Revision of March 27th, 1874. The act of that date for the first enabled married women to contract as if *sole,* with the proviso that nothing therein contained should enable her to become surety, &c.

But *Perkins* v. *Elliott* held that a married woman is liable in equity for her contract, even though it be in effect one of suretyship if she received any consideration whatever for it in the way of benefit to her separate estate. In that case the consideration alleged in the bill was that the note upon which the wife was sought to be charged was given in payment and discharge of a mortgage executed by herself and her husband upon her husband's land, and the increase of the value of her inchoate right of dower by the discharge of the mortgage was held to be a sufficient consideration. And in *Staats* v. *Van Sickel, 23 Vr. 370,* the supreme court, following *Perkins* v. *Elliott,* sustained an action against a wife upon a bond given by the husband and wife for part of the purchase-money of land conveyed to the husband, the only consideration for which bond so far as regards the wife being her inchoate right of dower in the land so conveyed.

In solving the question of liability here we must inquire *in limine* upon whom rests the burden of proof. The language of the act (*Rev., p. 637*) is:

> "That any married woman shall have the right to bind herself by contract in the same manner and to the same extent as though she were unmarried, and which contracts shall be legal and obligatory, and may be enforced at law or in equity, by or against such married woman, in her own name, apart from her husband; *provided*, that nothing herein shall enable such married woman to become an accommodation endorser, guarantor or surety, nor shall she be liable on any promise to pay the debt, or answer for the default or liability of any other person."

Under the older act of 1862 (*Nix. Dig. 1868 p. 548*), which enacted that " where a married woman transacts any business or purchases any property, and debts or claims thereby remain unsatisfied," an action may be brought at law &c., it was held by the supreme court that the declaration must allege, and the plaintiff must prove as a part of his case, the special facts out of which the liability arose. *Eckert* v. *Reutter, 4 Vr. 266; Lewis* v. *Perkins, 7 Vr. 133.* In the later of these cases the chief-justice, in citing the earlier, said: " The necessary consequences of this decision is that, in displaying a cause of action against a *feme covert*, in a court of law, it is necessary to show the circumstances which make her contract obligatory. *Her general condition is one of incapacity to bind herself by her agreement.* The particular facts, therefore, which remove such disability must appear, in order to make out a legal cause of action." But in *Hinkson* v. *Williams, 12 Vr. 35,* the same court held that a suit could be maintained and recovery had against the married under the later act—1873—upon the common counts alone. The court said that under the earlier act of 1862 and prior to the act of 1874 (above cited) the general condition of the wife was one of incapacity to contract, and her liability was exceptional, and that the effect of the act of 1874 was to reverse the condition and to render her capacity to contract general and the incapacity exceptional.

The act in question was also before that court in *Wilson* v. *Herbert, 12 Vr. 454; Cooley* v. *Barcroft, 14 Vr. 363; Van Deventer* v. *Van Deventer, 17 Vr. 461; Bank* v. *Dohm, 23 Vr. 363,.*

and *Staats* v. *Van Sickel, 23 Vr. 370,* and in none of them was it suggested that the plaintiff must allege the case was not within the exceptions found in the proviso of the act.   In *Wilson* v. *Herbert, 12 Vr. 454* (at *p. 456*), Mr. Justice Depue notices the question, and assumes that the statement of demand there under consideration was good without any special averment.   In *Staats* v. *Van Sickel* the declaration appears to have been in the usual form on a money bond and the position of the married woman as surety was set out in a plea.

These cases all seem to go on the ground that the burden is on the married woman who is sued on her contract to set out and prove that she *is* within the the exception of the proviso.   This is, I think, in accordance with the well-settled rule of construction that where an enacting clause is general, with a proviso containing exceptions, the burden is on the party claiming the benefit of the exceptions to set it out and prove that he is within it. *Pott. Dwar. Stat. 119; 1 Chit. Pl. 223; Bennett* v. *Hurd, 3 Johns. 438; Teel* v. *Fonda, 4 Johns. 304,* and *Simpson* v. *Ready, 12 Mees. & W. 736.*   Of course, if the contract sued upon shows upon its face that it is of the character mentioned in the proviso, the plaintiff in setting it forth states himself out of court.

The bill in this case sets out the joint bond of the three defendants without any allegation as to the relation of the parties as between themselves.   The answer, so far as relates to Mrs. Morgan, denies the making of the bond, and there is in it no allegation of suretyship.   The simple issue developed by the pleadings is, was the bond executed as alleged in the bill?   The complainant, therefore, was not called upon to prepare to meet the issue of suretyship, nor was it raised on the trial except incidentally.

The proofs show that the money was paid to the son and went to his credit in bank.   He swears that he paid it to his father, and I think it is fairly inferable from all the circumstances that he treated this money, as he did all other money which came to his hands from the business, as in reality his father's money.   As already observed, the business was managed by the father in the name of the son, while the title to the property stood in the name

28

of his wife. The case throughout shows that the father was considered and treated by everybody as the real proprietor. Mrs. Iredell went to him for interest on the $500 bond of the son secured by mortgage on the wife's property and he paid it to her. The persons who went to make inquiries and looked after Mrs. Iredell's rights in the securities in question in this cause went to the father, and seem to have paid no attention to the son or the mother, and the father answered that if the bonds were lost he would pay them. The father swears that he personally got the benefit of the money; that he was not engaged in any business, and that he used the money to pay off some debts that he owed, presumably debts incurred at or about the time of his failure, which was about four years before the loan of her money. He further said that he had some bonds and mortgages out, but whether as debts or assets does not affirmatively appear, except inferentially that they must have been his own bonds secured by mortgage on his wife's property. And again, on cross-examination, he swears that he attended to his wife's business, and then follows this evidence:

"And you say that when you borrowed this $600 you applied it to pay off some indebtedness on this property?

"*A.* My own indebtedness.

"*Q.* There were some obligations against this property, were not there?

"*A.* Yes, sir.

"*Q.* And you applied these $600 to the payment of some of them?

"*A.* I did not.

"*Q.* What did you apply them to?

"*A.* Other indebtedness I owed at places.

"*Q.* Were there any judgments against the property?

"*A.* Yes, sir.

"*Q.* That is what I thought.

"*A.* The property first was sold and other parties—[interrupted].

"*Q.* That is enough—wait one moment—judgments were entered against you before the properties were sold, were they not?

"*A.* Yes, sir."

That is all the evidence given by this witness as to the disposition of this money.

William A. Morgan, who, it will be remembered, swore that he paid the $500 mortgage at the time when the title to the

Reeves v. Morgan.

mortgaged premises was in his mother, testified as follows, on examination by the court:

"*Q.* This was your own money that you paid her?

"*A.* Yes, sir.

"*Q.* Well, why did you pay her that mortgage with your own money; the property belonged to your mother?

"*A. Yes, sir; all the property there belonged to my mother, and I always helped pay off all the mortgages.*

"*Q.* Did you take anything from your mother to show for it?

"*A. Several thousand dollars between mother and I, and we have not taken anything, mother and I, to show for it.*"

And further on he says that he took nothing from his father to show for the $600 borrowed from Mrs. Iredell and paid over to him.

Now, it is quite easy to imagine from this evidence, in connection with the other circumstances, how it is possible, and perhaps probable, that this money went to the benefit of the estate of Mrs. Morgan. In the first place, if it be true that the elder Morgan paid debts which were outstanding against him with it, those debts may have been and probably were incurred before the title of the property came to Mrs. Morgan, and if, as it seemed to be admitted at the hearing, she had no separate estate of her own, and paid nothing for the property, then a creditor of Morgan might well claim that she held it in trust for him, and that it was still liable in her hands for his debts, and in that way those debts were a menace to her title, and their payment and discharge tended to strengthen that title. Or, in the second place, considering the evidence of William A. Morgan, just quoted, it may have been that the money went to pay some obligation of the elder Morgan secured by mortgage on the premises, or some judgment which was a lien on the premises in the hands of the wife. Counsel for the complainant also relied upon the general aspects of the case, viz., that the wife held the property for the benefit of the husband and subject to his control, and that the money was paid to the son as the figure-head of the father, and that their affairs were and are so inextricably mixed that whatever is paid to one is paid to all, and whatever goes to the benefit of one goes to the benefit of all. And in support of this view is

the evidence of Mr. Sooy and Mrs. Paris, that, in the bargaining
about the board of the lunatic, Mrs. Morgan agreed that it
should go on account of what *"they"* owed Mrs. Iredell—that
*"they"* owed her so much. I place reliance upon this evidence,
while I am unable to do so upon that of the Morgans.

Upon the whole case I am not satisfied that the wife occupied
on this bond the position of a pure surety without any considera-
tion of benefit to her, and therefore the decree must go against
her.

I think it is not a case for indemnity, since the proofs satisfy
me that the bond is either in the defendant's hands or destroyed.

I will advise a decree that the bond and mortgage for $500 be
declared valid and existing securities, and the mortgage a valid
and existing lien on the mortgaged premises as of its original
position in order of priority, and the satisfaction piece and entry
of cancellation be set aside and declared void and of no effect,
and that these defendants are indebted to the complainant on
account of said $600 bond in the sum of $600, with interest from
April 1st, 1886, up to which time Mr. Sooy swears that the in-
terest was endorsed and paid upon it.

Complainant is entitled to costs.